LAFAYETTE & KUMAGAI LLP
GARY T. LAFAYETTE (State Bar No. 088666)
SUSAN T. KUMAGAI (State Bar No. 127667)
GLEN TURNER (State Bar No. 212417)
100 Spear Street, Suite 600
San Francisco, California 94105
Telephone:   (415) 357-4600
Facsimile:   (415) 357-4605
skumagai@lkclaw.com
gturner@lkclaw.com

STEPHEN L. SCHIRLE (State Bar No. 96085)
MARK H. PENSKAR (State Bar No. 77725)
DARREN P. ROACH (State Bar No. 159998)
77 Beale Street, B30A
P.O. Box 7442
San Francisco, California 94105
Telephone: (415) 973-6345
Facsimile: (415) 973-5520
dprc@pge.com

Attorneys for Defendant
PACIFIC GAS AND ELECTRIC COMPANY

UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| THOMAS KNOWLES and THOMAS HICKS, <br><br> Plaintiffs, <br><br> vs. <br><br> PACIFIC GAS & ELECTRIC COMPANY, DEANNA RADFORD, and DOES 1-20, <br><br> Defendants. | Case No. C 07-2284 JCS <br><br> **DEFENDANT PACIFIC GAS AND ELECTRIC COMPANY'S REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS COMPLAINT OF PLAINTIFFS THOMAS HICKS AND THOMAS KNOWLES** <br><br> Date:        September 4, 2007 <br> Time:        1:30 p.m. <br> Dept:        A <br> Judge:       Hon. Joseph C. Spero <br><br> Complaint Filed:  April 27, 2007 |

In support of its Notice of Motion and Motion to Dismiss Complaint of plaintiffs Thomas

Knowles and Thomas Hicks, defendant Pacific Gas and Electric Company ("PG&E")

respectfully requests the Court take judicial notice of the following documents:

///

1

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
100 SPEAR STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
FAX (415) 357-4600
FAX (415) 357-4605

1.      Agreement Applying To Operation, Maintenance and Construction Employees Between Pacific Gas and Electric Company and Local Union No. 1245, International Brotherhood of Electrical Workers ("IBEW"), effective January 1, 2000. (Attached as Exhibit "A.")

2.      Letter of Agreement, R3-97-53-PG&E, between Pacific Gas and Electric Company and Local Union No. 1245, International Brotherhood of Electrical Workers, executed April 14 1997. (Attached as Exhibit "B.") The PG&E-IBEW collective bargaining agreement specifically authorizes and incorporates letter agreements. (Exhibit "A," §§400.1 ("Company and Union may agree to enter into negotiations to clarify, modify, add to, or delete from the provisions of this Agreement."); 400.4 ("the [negotiating] Committee is authorize to settle the dispute referred to it…and to issue Letters of Agreement …revising and adding to this Agreement….").)

3.      Severance Agreement between PG&E and plaintiff Thomas Knowles, executed July 2, 2001. (Attached as Exhibit "C.")

4.      Severance Agreement between PG&E and plaintiff Thomas Hicks, executed July 2, 2001. (Attached as Exhibit "D.")

The Severance Agreements are cognizable because they are integral to plaintiffs' complaint and their authenticity can not been denied. See, e.g., Parrino v. FHP, Inc., 146 F.3d 699, 706 and fn. 4 (9th Cir. 1998) (holding that documents may be considered in evaluating a motion to dismiss without converting the motion into a summary judgment motion when "an attached document is integral to the plaintiff's claims and its authenticity is not disputed"). The Severance Agreements are additionally cognizable because they are attached to Defendant PG&E's counterclaim in this action and, thus, the Court may properly take notice of them as a part of the Court's own record. See, e.g., Shuttlesworth v. City of Birmingham, 394 U.S. 147,

///

///

///

///

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
100 SPEAR STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

2

157 (1969) (taking judicial notice of its own record); <u>Hymes v. Procunier</u>, 428 F.2d 824, 824 (9th

Cir. 1970) ("[o]f course, the district court can take judicial notice of its own records").


Dated:  July 30, 2007                          LAFAYETTE & KUMAGAI LLP

                                               */s/ Susan T. Kumagai*
                                               SUSAN T. KUMAGAI
                                               Attorneys for Defendant
                                               PACIFIC GAS & ELECTRIC COMPANY


<div align="center">**CERTIFICATE OF SERVICE**</div>

    I certify that a copy of this document was served electronically on July 30, 2007, on counsel of record in compliance with Federal Rule 5, Local Rule 5.6 and General Order 45, by use of the Court's ECF system.

                                               */s/ Susan T., Kumagai*
                                               SUSAN T. KUMAGAI

PGE\Know\Pldg\Mot to dismiss-RJN.doc

LAFAYETTE & KUMAGAI LLP
ATTORNEYS AT LAW
100 SPEAR STREET, SUITE 600
SAN FRANCISCO, CALIFORNIA 94105
(415) 357-4600
FAX (415) 357-4605

DEF  PG&E's REQUEST FOR JUDICIAL NOTICE IN SUPPORT OF MOTION TO DISMISS
COMPLAINT OF PLAINTIFFS THOMAS HICKS AND THOMAS KNOWLES
Case No  C07-2284 JCS

# EXHIBIT A

# *Agreement*

Between

# PACIFIC GAS AND ELECTRIC COMPANY



**Pacific Gas and Electric Company™**

WE DELIVER ENERGY.™

and

# LOCAL UNION NUMBER 1245 OF INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS



*Affiliated with*
AMERICAN FEDERATION OF LABOR -
CONGRESS OF INDUSTRIAL ORGANIZATIONS

APPLYING TO:
## OPERATION, MAINTENANCE AND CONSTRUCTION EMPLOYEES

EFFECTIVE  JANUARY 1, 2000

October 2, 1997

PG&E COMPANY EMPLOYEES:

PG&E Company and IBEW Local 1245 reaffirmed today their commitment to continue the labor-management partnership process that was established in April 1995 to address issues related to the maintenance and operation of gas and electric systems to ensure the delivery of safe, reliable, and responsive service to PG&E customers.

The principles of Letter Agreement 94-53 will be utilized to establish labor management cooperation committees to address the following issues:

- Determine the labor force required to deliver safe, reliable and responsive service, and to address issues related to storm response, infrastructure maintenance, etc.

- Determine appropriate Performance Based Ratemaking targets to be used in future CPUC proceedings.

PG&E Company and IBEW Local 1245 reaffirm their commitment to work together in a collaborative manner to address issues critical to PG&E's ability to compete now and in the future, and to promote profitability for PG&E, and employment and income security for PG&E employees. It is in our mutual best interest - the company's the union's and the employees' - to ensure PG&E's success.

/s/ Gordon R. Smith
GORDON R. SMITH
President and CEO
PG&E Company

/s/ Jack McNally
JACK McNALLY
Business Manager
IBEW Local 1245

AGREEMENT

between

PACIFIC GAS AND ELECTRIC COMPANY

and

LOCAL UNION NO. 1245

of

INTERNATIONAL BROTHERHOOD

OF ELECTRICAL WORKERS

Affiliated with

AMERICAN FEDERATION OF LABOR
CONGRESS OF INDUSTRIAL ORGANIZATIONS

APPLYING TO
OPERATION, MAINTENANCE AND
CONSTRUCTION EMPLOYEES

EFFECTIVE JANUARY 1, 2000

## TABLE OF CONTENTS

**TITLE**                                                         **PAGE**

1. PREAMBLE ............................................................................................................ 1
2. RECOGNITION ....................................................................................................... 1
3. CONTINUITY OF SERVICE .................................................................................. 2
4. UNION SECURITY ................................................................................................. 3
5. UNION ACTIVITY ................................................................................................... 4
6. WAGES .................................................................................................................... 4
7. MANAGEMENT OF COMPANY ........................................................................... 4
8. LABOR-MANAGEMENT COOPERATION .......................................................... 5

### PART I - REGION, DEPARTMENT, AND GENERAL CONSTRUCTION EMPLOYEES

100. APPLICATION ........................................................................................................ 6
101. LEAVE OF ABSENCE ........................................................................................... 6
102. GRIEVANCE PROCEDURES ............................................................................... 9
103. HOLIDAYS ............................................................................................................. 15
104. MEALS .................................................................................................................... 17
105. SAFETY .................................................................................................................. 19
106. STATUS .................................................................................................................. 21
107. MISCELLANEOUS ................................................................................................ 24
108. SUPPLEMENTAL BENEFITS FOR INDUSTRIAL INJURY ............................. 24
109. APPRENTICESHIP TRAINING ............................................................................ 24
110. PREMIUM PAY ...................................................................................................... 25
111. VACATIONS ........................................................................................................... 26
112. SICK LEAVE .......................................................................................................... 30

### PART II - REGION OR GENERAL OFFICE DEPARTMENT EMPLOYEES ONLY

200. APPLICATION ........................................................................................................ 32
201. EXPENSES ............................................................................................................ 32
202. HOURS ................................................................................................................... 34
203. INCLEMENT WEATHER PRACTICE .................................................................. 39
204. WAGES AND CLASSIFICATION ........................................................................ 39
205. JOB BIDDING, PROMOTION AND TRANSFER ............................................... 41
206. DEMOTION AND LAY OFF PROCEDURE ........................................................ 46
207. *(DELETED)* ........................................................................................................... 52
208. OVERTIME ............................................................................................................. 53
209. (DELETED) ............................................................................................................ 56
210. (DELETED) ............................................................................................................ 56
211. (DELETED) ............................................................................................................ 56
212. EMERGENCY DUTY ............................................................................................ 56
213. (DELETED) ............................................................................................................ 58
214. (DELETED) ............................................................................................................ 58

### PART III - GENERAL CONSTRUCTION EMPLOYEES ONLY

300. APPLICATION ........................................................................................................ 58
301. EXPENSES ............................................................................................................ 58
302. HOURS ................................................................................................................... 64
303. INCLEMENT WEATHER ...................................................................................... 65
304. WAGES AND CLASSIFICATIONS ...................................................................... 66
305. JOB BIDDING AND PROMOTION ...................................................................... 67
306. DEMOTION AND LAY OFF PROCEDURE ........................................................ 73
307. (DELETED) ............................................................................................................ 77
308. OVERTIME ............................................................................................................. 77
309. (DELETED) ............................................................................................................ 80
310. (DELETED) ............................................................................................................ 80
311. (DELETED) ............................................................................................................ 80

### PART IV - INTERIM NEGOTIATIONS

400. INTERIM NEGOTIATIONS ................................................................................... 80

### PART V - TERM

500. TERM ...................................................................................................................... 80

## PART VI

600.  JOB DEFINITIONS AND LINES OF PROGRESSION ........................................... 81

## EXHIBITS

I.    EDUCATIONAL ASSISTANCE .......................................................................... 83
II.   GENERAL CONSTRUCTION PROMOTION-DEMOTION GEOGRAPHIC AREAS ........ 85
III.  CLASSIFICATIONS OF SHIFT EMPLOYEES ...................................................... 86
IV.   CLASSIFICATIONS OF SERVICE EMPLOYEES ................................................. 86
V.    CLASSIFICATIONS OF RESIDENT EMPLOYEES ............................................... 87
VI.   JOB DEFINITIONS AND LINES OF PROGRESSION ........................................... 87
VII.  BEGINNER'S CLASSIFICATIONS ................................................................... 87
VIII. JOB COMPARISONS .................................................................................... 90
IX.   CLASSIFICATIONS COMMON TO MORE THAN ONE DEPARTMENT ................... 91
X.    WAGES
      MATERIALS DISTRIBUTION
        Warehouse Operations ........................................................................... 93
        Decoto Pipe Yard and Plant .................................................................... 94
        Machine Shop ........................................................................................ 95
        Electric and Utility ................................................................................. 96
      ACCOUNTING AND COMPUTER OPERATIONS DEPARTMENT
        Customer Accounting ............................................................................. 97
      CUSTOMER SERVICES DEPARTMENT
        Customer Service ................................................................................... 97
      ELECTRIC DEPARTMENT
        Office .................................................................................................... 98
        Transmission and Distribution ................................................................. 98
        Meter ................................................................................................... 101
        Maintenance ........................................................................................ 102
        Operating ............................................................................................ 106
        Clerical-Hydro ...................................................................................... 110
      GAS DEPARTMENT
        Transmission and Distribution ............................................................... 111
        Steam Heat .......................................................................................... 112
        Service ................................................................................................ 113
        Measurement and Control ..................................................................... 114
        Plant Maintenance ............................................................................... 115
        Gas Meter Repair Facility ...................................................................... 116
      GENERAL SERVICES DEPARTMENT
        Garage ................................................................................................ 117
        Warehouse ........................................................................................... 118
        Building Service ................................................................................... 119
        Miscellaneous ...................................................................................... 121
      GAS SYSTEM MAINTENANCE & TECHNICAL SUPPORT/GAS SYSTEM OPERATIONS
        Maintenance ........................................................................................ 121
        Operations ........................................................................................... 125
      STEAM GENERATION & NUCLEAR POWER GENERATION DEPARTMENTS
        Operating ............................................................................................ 128
        Electrical Maintenance .......................................................................... 130
        Mechanical Maintenance ....................................................................... 131
        Technical Maintenance .......................................................................... 132
        Clerical ................................................................................................ 133
        Operating (DCPP) ................................................................................. 134
        Electrical Maintenance (DCPP) .............................................................. 135
        Mechanical Maintenance (DCPP) ........................................................... 136
        Technical Maintenance (DCPP) .............................................................. 137
        Fire Department (DCPP) ........................................................................ 139
        Clerical (DCPP) .................................................................................... 139
      WATER DEPARTMENT
        Water Department ................................................................................. 140
      GENERAL CONSTRUCTION
        Field Classifications .............................................................................. 143
        Service Center Classifications ................................................................ 153
XI.   LETTER AGREEMENT 87-165-PGE PRODUCTIVITY ENHANCEMENT COMMITTEES ...... 157
XII.  ADDENDUM TO TITLE 206 AND 306 DEMOTION AND LAY OFF PROCEDURE ........ 158
XIII. LETTER AGREEMENT 91-99-APPOINTMENT DUE TO URGENT NECESSITY ......... 158
XIV.  SEVERANCE ............................................................................................. 160
XV.   CLARIFICATION TO SUBSECTION 301.4(a) ................................................. 160
XVI.  CONTRACTING .......................................................................................... 161
XVII  METER READER AGREEMENT (See Separate Booklet)

SUPPLEMENTS

SUPPLEMENT TO SECTION 1.7 .................................................................. 164
SUPPLEMENT TO TITLE 104 - MEALS: COMPARABLE SUBSTITUTE FOR USUAL
  AND AVERAGE MEALS ........................................................................ 165
SUPPLEMENT TO TITLE 205 - BIDDING UNITS ........................................ 166
SUPPLEMENT TO TITLE 206 - DEMOTION UNITS ..................................... 169
CRITICAL CLASSIFICATIONS .................................................................. 173

provided, however, that an appointment shall not be made hereunder to a classification which has a wage rate higher than the classification of the employee who requests the transfer. For consideration under this Section, an employee shall submit to the Company, by United States mail, a letter outlining reasons for such request in accordance with Letter Agreement 91-99 (See Exhibit XIII - Procedures to be Utilized in Connection with Hardship Transfers.) When a vacancy occurs at a location that could alleviate the employee's problem, Company and Union may agree in writing to the appointment of the employee to such vacancy. (Amended 1-1-94)

## 205.18  EXCHANGE OF HEADQUARTERS

Company, by written agreement with Union, may consent to an exchange of headquarters between employees in the same classification and Line of Progression without reference to the foregoing provisions of this Title.

## 205.19  ENABLING CLAUSE

By written agreement between Company and Union, other provisions may be substituted for the provisions of this Title.

## 205.20  POSTING OF JOB AWARDS

(a)     (Deleted 1-1-88)

Company shall post biweekly on the bulletin boards in each headquarters within the system a list of all job awards made through prebids and through transfers since the last list was posted. Such list will include the job vacancy number (where appropriate) and headquarters, the appointed employee's name and Service, and the Agreement Section relied upon for the award. (Amended 1-1-88)

## 205.21  TOP RATE OF PAY OF THE NEXT LOWER CLASSIFICATION

For the purpose of clarification, the "top rate of pay of the next lower classification" is defined as the top wage rate of that classification which has the lowest maximum wage rate of the group of classifications combined and indicated as the next lower to any particular higher classification.

To be entitled to preferential consideration under Subsection 205.7(b) or (c), except as otherwise provided in any applicable apprenticeship agreement, an employee receiving the "top rate of pay of the next lower classification" as defined above must have worked in such listed "next lower classifications," or the "same or higher classifications" for a period of time equal to or greater than the time required to progress from the starting wage rate to the top wage rate for that "next lower classification" having the lowest maximum wage rate.

Where a clerical classification is among a group of classifications listed in Exhibit VI as "next lower" in a physical Line of Progression, the physical classification with the lowest maximum wage rate shall prevail in determining the amount of time required to be worked in such listed "next lower classifications." (Amended 1-1-88)

## 205.22  QUALIFICATIONS FOR GENERAL CONSTRUCTION EMPLOYEES BIDDING/TRANSFERRING TO REGION OR GENERAL OFFICE DEPARTMENT JOBS

An employee in General Construction must pass the appropriate, agreed-to employment test battery before the employee's bid to fill a job vacancy in a Region or General Office Department under the provisions of Title 205 will be considered.

Such employee shall be entitled to two opportunities to pass the test referred to above. The second attempt to pass such test must be a minimum of three months from the date of the initial attempt. However, where the parties have agreed that certain classifications, other than normal entry level, have substantially identical tasks in General Construction as in the Regions or General Office Departments, successful performance by an employee in such classification will be considered as presumptive evidence of meeting the appropriate agreed-to test requirements. Additionally, a former General Construction employee who has become a Region or General Office Department employee at the journeyman level or below must meet the agreed-to test battery to meet the employment requirements for Region or General Office Department employees before being promoted to a Working Foreman job on other than a temporary basis. Notwithstanding the foregoing, successful performance as a temporary Working Foreman in a Region or General Office Department for a cumulative total of six months or more shall be presumptive evidence of meeting such requirements.

An employee in General Construction, other than an employee in a journeyman classification in the same Line of Progression as that in which the vacancy exists, must pass the appropriate agreed-to apprentice entrance tests, as designated in Paragraph A of the Master Apprentice Agreement before the employee's bid to fill a vacancy in an apprentice or a journeyman classification will be considered. The employee shall be entitled to retest following failure on the same schedule as a Region or General Office Department employee. (Amended 1-1-88)

## TITLE 206. DEMOTION AND LAY OFF PROCEDURE

## 206.1   GENERAL RULES (REGULAR EMPLOYEES)

The provisions of Title 206 which are applicable to employees with one continuous year of service in cases of displacement, demotion, or layoff due to lack of work or the return of an employee from leave of absence for

Union business or military service shall be applied in such manner as to give effect to the following: (Amended 1-1-94).

(a)    Employees shall be given as much notice as practicable of Company's proposed action. Following such notice, and prior to the date of the proposed action, employees to be affected by the procedure *due to lack of work* shall be considered as though they had already been demoted, and, notwithstanding the provisions of Title 205, have their bids to fill vacancies, in the normal Line of Progression, considered under the provisions of Section 206.9. Subsection 206.1(b) through Section 206.14 shall apply to employees being displaced or demoted due to lack of work *or employees being displaced by another employee due to lack of work*. *(Amended 1-1-00)*

(b)    An employee's Service, as defined in Section 106.3 shall be the determining factor in the application of this Title.

(c)    Where a vacancy in an appropriate classification exists, the filling of such vacancy in accordance with the appropriate provisions of this Title shall be substituted for the displacing of another employee as provided herein. (Amended 1-1-*00*)

(d)    An employee may not elect to displace another employee whose Service is equal to or greater than his/her own. An employee may not displace an employee in a classification having a wage rate higher than that of his/her own classification except where such classification is considered to be the same in accordance with a Line of Progression as provided for the Title 600 and Exhibit IX - "Same Classifications" *or where such classification is a beginners classification*. (Amended 1-1-*00*)

(e)    Employees shall be demoted, displaced, laid off, or effect elections under the provisions of this Title on the basis of their regular classification, headquarters and Line of Progression at the time of any such action.

(f)    In the application of the Title, an employee shall not be placed in a job unless qualified to perform the duties.

(g)    In the application of this Title, part-time employees and intermittent employees are considered to be a different classification than full-time employees under the same job title. Part-time employees and intermittent employees will not be able to displace full-time employees, regardless of seniority. Part-time employees can only displace other part-time employees in the same or lower classifications within their normal Line of Progression. Intermittent employees can only displace other intermittent employees in the same or lower classifications within their normal Lines of Progression. (Added 1-1-88)

(h)    No regular full-time employee will be displaced, demoted, or laid off due to the usage of part-time employees. Further, at a headquarters where Title 206 is to be implemented, all part-time employees shall be affected prior to regular full-time employees. (Added 1-1-91)

## 206.2  NOTICES

The following notices shall be given in connection with the demotion, *displacement* and layoff provisions of this Title: *(Amended 1-1-00)*

(a)    Company will give *all employees as much notice as possible of an impending displacement, but in no case less than 14 calendar days. Further,* Company will give an employee who is to be demoted *or displaced due to lack of work* as much notice thereof as possible, *but in no case less than 14 calendar days.* (Amended 1-1-*00*)

(b)    All employees *will be given an opportunity to* notify the Company, *through the completion of the employee option form, of their preferential order in which Section 206.3 through 206.7 shall be administered. This information will be kept on file for use in any displacement action and may be updated by the employee at any time up to 2 days prior to the start of a displacement action.* Preferential consideration shall be given to employees in the order of their Service, while Company shall endeavor to give effect to an employee's preference in the order he/she has indicated. Length of Service shall be the determining factor where two or more employees express a preference for a single location. Company shall notify an employee as to the specific location to which such employee will be transferred. *(Amended 1-1-00)*

(c)    An employee's failure to give the notice prescribed in Subsection (b) will result in the *Company applying the following preference sequence: 1) 206.3 to immediate next lower classification; 2) regular sequence of consideration of 206.4 to Area, then Unit, then System; 3) 206.5 to Area and then Unit; 4) 206.6 to Area, then Unit, then System; and 5) 206.7 layoff.* (Amended 1-1-*00*)

(d)    Any transfer resulting from the application of this Section will be made effective at any time after the expiration of ten workdays from the giving of the notice provided for in Subsection (a). (Amended 1-1-88)

(e)    By agreement between Company and Union, the notice periods in this Section may be extended. (Added 1-1-91)

## 206.3  DEMOTION IN LINE OF PROGRESSION

When a demotion or displacement is to be made in a classification at a Company headquarters, the employee with the least Service in such classification shall be demoted to the next lower classification in the reverse order of the normal Line of Progression.  An employee shall be demoted on a step by step basis; that is, the employee shall first be demoted in the reverse order of the normal Line of Progression for his/her classification to the next lower classification and, at such step, if the employee is subject to further demotion, the employee may exercise the election provided for in Section 206.4 or Section 206.5, as the case may be.  If successive demotions must be made, the same procedure shall apply at each step until the employee is either placed in another job or is laid off.  If more than one demotion is to be made, the within procedure shall first be applied to the highest classification to be affected, and then to successively lower classifications.  (Amended 1-1-91)

## 206.4  ELECTIONS TO CHANGE HEADQUARTERS OR DEPARTMENT

(a)      *Elections to retain department:*  An employee with three years or more of Service, who is to be demoted or displaced as provided in Section 206.3 has the following elections *within his or her department:* *(Amended 1-1-00)*

(1) may elect to displace that employee in the same classification and department within the Demotion Area who has the least Service, or if no such election is available;  (Amended 1-1-91)

(2) may elect to displace that employee in the same classification and department within the Demotion Unit who has the least Service, or if no such election is available;  (Amended 1-1-94)

*(3)* may elect to displace that employee in the same classification and department in the System who has the least Service, *(Amended 1-1-00)*

(b)      *Elections to change department:*  An employee with three years or more of Service, who is to be demoted or displaced as provided in Section 206.3 also has the following elections: (Added 1-1-00)*

*(1)* may elect to displace that employee in the same classification in the Demotion Area who has the least Service, or if no such election is available;  (Amended 1-1-00)

*(2)* may elect to displace that employee in the same classification in the Demotion Unit who has the least Service, or if no such election is available;  (Amended 1-1-00)

*(Deleted 1-1-00)*

*(3)* may elect to displace that employee in the same classification in the System who has the least Service.  (Amended 1-1-00)

(c)      An employee with less than three years of Service who is to be demoted or displaced as provided in Section 206.3 has the following elections:  *(Amended 1-1-00)*

(1) may elect to displace that employee in the same classification and department within the Demotion Area who has the least Service, or if no such election is available;  (Amended 1-1-91)

(2) may elect to displace that employee in the same classification and department within the Demotion Unit who has the least Service, or if no such election is available;  (Amended 1-1-94)

(3) may elect to displace that employee in the same classification within the Demotion Area who has the least Service, or if no such election is available;  (Amended 1-1-91)

(4) may elect to displace that employee in the same classification within the Demotion Unit who has the least Service.  (Amended 1-1-94)

(d)      An employee who has been demoted or displaced, as provided in Section 206.3, before exercising the election provided by Subsection (a) hereof, may exercise such elections as if the demotion has not occurred.  *(Amended 1-1-00)*

(e)      Under a systemwide application of Title 206, the three year service requirement under Sections 206.4 and 206.6 will be waived.  (Added 1-1-00)*

## 206.5  ELECTION TO RETURN TO PREVIOUS LINE OF PROGRESSION

(a)      If an employee cannot effect a demotion or displacement in accordance with Section 206.3 and, if in addition, such employee does not for any reason effect an election in accordance with Section 206.4, the employee may, if such employee has previously worked for at least six months in any other classification in another Line of Progression in Company, elect to displace that employee in such classification and Line of Progression in the employee's Demotion Area who has the least Service.  An employee may exercise an election under the provisions of this Section only when it is for the purpose of returning to the Line of Progression in which the employee worked immediately prior to entering the Line of Progression from which the election was exercised.  (Amended 1-1-91)

48

(b)  If an employee cannot effect a demotion or displacement in accordance with Section 206.5(a) above, the employee may, if he/she has previously worked for at least six months in any other classification in another Line of Progression in Company, elect to displace that employee in such classification and Line of Progression in such employee's Demotion Unit who has the least Service. An employee may exercise an election under the provisions of this Section only when it is for the purpose of returning to the Line of Progression in which the employee worked immediately prior to entering the Line of Progression from which the election was exercised. (Amended 1-1-97)

## 206.6  BUMPING EMPLOYEE IN BEGINNER'S JOB

(a)  If the Company cannot effect a demotion or displacement of an employee in accordance with Section 206.3 and, if in addition, such employee does not for any reason effect an election in accordance with Section 206.4 or 206.5, he/she may elect to displace that employee in the Demotion Area, in a beginning classification who has the least Service *for which* he/she meets the qualifications of the transfer. (Amended 1-1-00).

(b)  If the Company cannot effect a demotion or displacement of an employee in Subsection (a) hereof, such employee may elect to displace that employee in the Demotion Unit in a beginning classification, who has the least Service, *for which* the employee meets the qualifications of a transfer. (Amended 1-1-00)

(c)  If the Company cannot effect a demotion or displacement of an employee in Subsections (a) and (b) hereof, if the employee has been employed three years or more, such employee may elect to displace that employee in the Company in a beginning classification, who has the least Service, *for which* the employee meets the qualifications for a transfer. *(Amended 1-1-00)*

## 206.7  LAYOFF

(a)  *An employee can elect layoff in lieu of exercising options under 206.3, 206.4, 206.5 or 206.6. Further, an employee who does not effect a displacement under any of the elections in Section 206.3, 206.4, 206.5, and 206.6, will be laid off. (Amended 1-1-00)*

(b)  *An employee who is not affected by this Title may elect to take a layoff under this Title, without employing applications of Sections 206.1 through 206.6, thereby reducing the number of employees affected. Such employee shall have preferential rehire rights as provided under Section 206.13. This option for layoff is restricted to employees in impacted classifications and headquarters. (Added 1-1-00)*

## 206.8  MOVING ALLOWANCE

(a)  When an employee is displaced under the provisions of this Title *because* of lack of work at his/her headquarters, and the employee's new headquarters is beyond commutable distance from his/her residence, Company shall reimburse the employee for the reasonable costs incurred in connection with moving his/her household in a sum not to exceed $2,400. (Amended 1-1-94)

(b)  Reasonable costs as referenced above shall include and are restricted to: (Amended 1-1-94)

(1)  Transportation of the employee and his/her immediate family to the new headquarters location (one trip only). (Amended 1-1-94)

(2)  Meal and motel expenses for the above incurred on moving day when movers cannot complete the move on the same day. (Amended 1-1-94)

(3)  Moving of furniture and household goods to the new residence. (Amended 1-1-94)

(4)  Cost of containers to be used in moving less applicable credits for returned items, such as, barrels, wardrobes and boxes. (Amended 1-1-94)

(5)  Reasonable insurance on furniture and household goods. (Amended 1-1-94)

(6)  Installation of television antenna and cable connections. (Amended 1-1-94)

(7)  Piping and wiring costs to accommodate moved appliances. (Amended 1-1-94)

(8)  Reasonable costs of any kind and all non-refundable deposits and/or hook-up fees for water, garbage, telephone, gas and electric. (Amended 1-1-94)

All expenses not specifically covered above are excluded from payment under this Section. (Amended 1-1-94)

*Although there is no time limit on when the move should occur,* notice of intent to move must be filed by the employee within 90 days after his/her transfer in order to quality for reimbursement of moving expenses outlined above. All requests for reimbursement for moving expenses must be presented together with proper receipts before payment can be granted. *(Amended 1-1-00)*

49

(c)       "Beyond commutable distance," as used above, shall mean a new headquarters located more than 45 minutes or 30 miles from his/her present residence.  (Amended 1-1-94)

(d)       *An employee is not required to move within a commutable distance (45 minutes or 30 miles) to become eligible for a moving allowance, but must move closer to the new headquarters to qualify.  (Added 1-1-00)*

## 206.9   ACCELERATED PROMOTION

For the purpose of enabling employees who have been demoted or transferred under the provisions of this Title, or to enable employees who have been on or are on Long-Term Disability status, to return to their former status *(includes former classification and department and/or any other intermediate classification in the department and in the Line of Progression)*, on an accelerated basis, Company will give preferential consideration in the following sequence to the bids and transfer applications submitted by such employees on any job vacancy: *(Amended 1-1-00)*

(a)       Bids and transfer applications submitted by employees who formerly worked in such job classification and headquarters, and who were transferred from such headquarters, demoted from such classification, or were placed on Long-Term Disability status from such headquarters.  An employee's bid or transfer application shall not be considered under this Subsection if following demotion or transfer the employee has not exercised each opportunity available to return to a job in his/her former classification and headquarters. (Amended 1-1-91)

(b)       *Bids and transfer applications submitted by employees listed in Subsection (a) above who formerly worked in such job classification and Area.  (Added 1-1-00)*

(c)       *Bids and transfer applications submitted by employees listed in Subsection (a) above who formerly worked in such job classification.  (Amended 1-1-00)*

(d)       Should an employee return to a classification and/or Line of Progression under the provisions of Section 206.13 other than one from which such employee was demoted, transferred or laid off, such placement shall not be considered as voluntarily removing himself/herself from the Line of Progression to which such employee would have accelerated promotional rights under the provisions of this Section.  *(Amended 1-1-00)*

In considering, under Subsections (a), (b) or (c), bids or transfer applications received from two or more employees on the same job, Company shall give preferential consideration to the bid or transfer application submitted by the employee who has the greatest Service.  *(Amended 1-1-00)*

An employee who has been demoted or transferred under the provisions of this Title who thereafter voluntarily removes himself/herself from the Line of Progression to which the employee was previously transferred or demoted shall not be given consideration under this Section. (Amended 1-1-91)

## 206.10   DEMOTION INTO UNIT FROM OUTSIDE

(a)       When by reason of lack of work at the employee's headquarters the Company demotes into a classification in the collective bargaining unit a supervisory or other employee who was not at the time of demotion a member of such unit such employee shall thereupon be entitled to exercise the rights set forth in this Title. (Amended 1-1-91)

(b)       In no case shall such demoted employee be placed into a classification that is higher than the classification held prior to leaving the bargaining unit subject to Subsection 206.1(f).  (Added 1-1-88)

(c)       Company shall not demote into the collective bargaining unit a supervisor or other employee who was hired or left the bargaining unit on January 1, 1991 or thereafter.  (Added 1-1-91)

## 206.11   NOTICE OF LAYOFF

When it becomes necessary for Company to lay off employees because of lack of work Company shall give employees involved as much notice thereof as practicable, but in no event shall a regular employee be given less than ten workdays' notice of layoff, provided, however, that notice of layoff need not be given to employees who are employed on a probationary basis.  (Amended 1-1-88)

## 206.12   ENABLER

By written agreement between Company and Union, special provisions may be substituted for the provisions of this Title.

## 206.13   REEMPLOYMENT PROVISIONS

(a)       Notwithstanding any other provision of this Agreement, a regular employee who has been laid off for lack of work pursuant to the provisions of this Agreement for a period not in excess of thirty months and who had one or more years of Service at the time of layoff shall be entitled to preferential rehire on the basis of Company Service at the time of layoff, providing that the laid-off employee keeps the Company informed in writing of the current mailing address and telephone number for contact and the Part II Bidding Unit(s) and/or Part III Promotion-Demotion

Geographical Area(s) for which reemployment will be accepted and whether the laid-off employee wants to be considered for part-time employment. The employee will be notified of the proper method for informing the Company. Company shall maintain one address to which the above notice may be mailed.

   (b)    When a vacancy exists in a:

      (i)    beginning classification covered by this Agreement, or;

      (ii)    classification above beginning level that is not filled pursuant to the provisions of Section 205.7 (a) through (d) or Section 305.5 of this Agreement, or;

      (iii)    part-time position that is not filled pursuant to the provisions of Section 205.5 (a), (b) or (d) of this Agreement.

   Company shall provide notice of openings for reemployment as follows:

      (1)    By calling the last telephone number furnished by the laid-off employee and offering reemployment. If contacted by telephone, such employee must advise Company whether or not such employment will be accepted within three working days and the employee must be available for work within seven calendar days.

      (2)    If the laid-off employee cannot be reached by telephone, Company shall forward notice by Certified Mail Return Receipt Requested of openings for reemployment to the last mailing address as furnished by the laid-off employee.

      Within three working days after such notice is received at such mailing address, such laid-off employee must advise Company whether or not the reemployment offer will be accepted, and the employee must be available for work within seven calendar days after so advising Company. If the certified letter is returned undeliverable, such employee will be considered terminated, and the next employee on the laid-off list may be notified of the opening.

      (3)    To expedite rehiring, more than one employee may be notified of an opening, but priority shall be given to employees in the order of Service at the time of layoff. If no employee remains on the laid-off list, the provisions of Section 205.5 will be invoked.

      (4)    Company shall not be required to contact laid-off employees when the openings for reemployment is outside the Part II Bidding Unit(s) and departments and/or the Part III Promotion-Demotion Geographic Area(s) and department(s) in which such employee has indicated a desire to accept reemployment.

      (5)    If Company cannot contact the laid-off employee by telephone and if no reply is received by Company within three working days after notice is received at the employee's mailing address, or if the laid-off employee does not accept reemployment to a full-time position or report for work within the time periods provided in this Subsection, such employee will be considered terminated, with no further reemployment rights under this Section, and the next employee on the laid-off list may be notified of the opening. If the laid-off employee declines an offer of part-time employment, such employee will not be considered for reemployment to future part-time positions.

      (6)    An employee returning to a classification under the provisions of this Section must possess the necessary skills, ability and physical qualifications to perform the duties of the position to which he/she returns.

   (c)    The Certified Mail Return Receipt in (b) above shall be retained by the Company for a period of one year after the notice was mailed to the laid-off employee and shall serve as proof of such notice actually being mailed. (Entire Section Amended 1-1-94)

## 206.14 JOURNEYMAN RETENTION

   If in the application of the provisions of this Title an employee in a classification which, in the normal Line of Progression, is higher than an apprentice classification can effect a displacement in such classification, the former shall not take such apprentice classification, but shall be given the rate of the classification next higher thereto. (Amended 1-1-80)

### DEMOTION OTHER THAN FOR LACK OF WORK

   Except for Sections 206.9 and 206.12 the foregoing Sections 206.1 through 206.14 apply only to an employee demoted for lack of work. Demotion for any reason other than for lack of work is provided for as follows: (References Amended 1-1-80)

## 206.15 DEMOTION OF UNIT EMPLOYEE

   An employee who is demoted for any reason other than for lack of work may be placed in a vacancy created in such employee's headquarters by the promotion of one or more employees to fill the job which the demoted employee vacated. If no such vacancy occurs the employee may be demoted to a vacancy in a lower classification in the Demotion Area in which he/she is employed or if no such vacancy occurs, the employee may be demoted to a vacancy in a lower classification in the Region in which he/she is employed. In the application of this Section, an employee shall be demoted to a vacancy in the first successively lower classification which the employee is qualified to fill. (Amended 1-1-91)

**206.16 DEMOTION OF NON-UNIT EMPLOYEE INTO UNIT**

(a) A supervisory or other employee who was not at the time of demotion a member of the collective bargaining unit but who formerly worked in a classification which is in such unit may be demoted for any reason other than for lack of work into a previously existing vacancy in such unit within the Demotion Area in which the employee is employed or into a vacancy which has been created in any Demotion Area by the concurrent transfer or promotion of an employee out of such unit in connection with such demotion. (Amended 1-1-91)

(b) In no case shall such demoted employee be placed into a classification that is higher than the classification held prior to leaving the bargaining unit subject to Subsection 206.1(f). (Amended 1-1-84)

(c) Company shall not demote into the collective bargaining unit a supervisor or other employee who was hired or left the bargaining unit January 1, 1991 or thereafter. (Added 1-1-91)

**206.17 RELOCATION OTHER THAN FOR LACK OF WORK**

When it becomes necessary to relocate individuals, crews, or groups of employees in a headquarters/office due to the closing of a reporting headquarters/office or when such relocation is necessitated by a shift of workload or other economic consideration, either of which is expected to be permanent, and where the number and the classification of jobs in the Demotion Area will be unchanged, the following procedure shall be followed: (Amended 1-1-91)

(a) All employees in a headquarters/office, including those on leaves of absence, off sick, on vacation, or off on disability, shall be considered on the basis of Service, as defined in Section 106.3, in the following Subsections.

(b) Employees with the greater Service shall be given the first opportunity to relocate.

(c) In the event there are insufficient volunteer(s) for such relocation, the employee(s) with the least Service in the affected classifications shall be relocated.

(d) Each employee in Subsection (c) above shall be given as much notice as possible of the impending relocation and such employee may elect either:

(1) to fill any vacancy in the employee's classification in the Demotion Area in which the employee is assigned, notwithstanding Subsection 205.6(a) or (Amended 1-1-91)

(2) to fill the vacancy in the employee's classification created at the new location where such job is relocated.

(e) An employee so displaced in Subsections (b) and (c) above shall be given preferential consideration under Section 206.9 to return to such employee's former headquarters/office.

(f) An employee relocated in accordance with Subsection (b) or (c) above shall be entitled, when appropriate, to the provisions of Section 206.8.

(g) Unassigned classifications, as provided for in the Master Apprenticeship Agreement, relocated under the provisions of this Section shall be immediately reclassified as "Assigned" to the headquarters/office where such job is to be relocated.

(h) Company shall not implement the provisions of this Section for the purpose of subverting Titles 201, 202, or 205.

(Entire Section Added 1-1-80)

**206.18 TECHNOLOGICAL CHANGES**

Company shall continue to provide Union with as much notice as practicable of technological changes in its business which may have a significant effect on its workforce. In such circumstances, Company and Union shall then meet to study and endeavor to adopt appropriate solutions, such as retraining or special placement, as may be practicable before Company implements the provisions of Titles 206, 306, and 19 of the Physical and Clerical Agreements. (Added 1-1-88)

## TITLE 207. MISCELLANEOUS

**207.1** (Deleted 9-1-53 – See Section 107.1)

**207.2** *(Deleted 7-1-00)*

**207.3** (Deleted 7-1-62)

**207.4** (Deleted 7-1-60)

"Work" as used in this Section 308.15 is defined as time for which an employee is paid while actively working at such employee's assigned job. This definition does not include travel time, time paid for a meal after dismissal from work and prearranged overtime cancellation payments when the employee has not reported for work. Nor does it include shifts which overlap calendar days by a period of one hour or less.

(1)     Any non-workday or holiday on which an employee is not regularly scheduled to work, where an employee volunteers for overtime work (see (c)(2) and (3) above) shall not be included in the determination of 21 straight days, and such days will count as days off whether or not the employee works. (Application of this Section will be made to other regular workdays where employee does not work, e.g., jury duty, etc.)

(2)     (a)     One day off during the first seven consecutive days worked shall constitute a break in the 21-day accumulation.

(b)     One day off after seven consecutive days of work shall not constitute a break in the 21-day accumulation; however, such a day off shall not be counted as a day of work. The count towards 21 consecutive days shall continue upon the employee's return to work. For example, if an employee who has worked 13 consecutive days takes a single day off, the day such employee returned to work shall be the 14th day towards the accumulation of 21 consecutive days.

(3)     Successive workweeks of six days worked and one day off are permissible with no requirement of granting two consecutive days off. (Entire Section Amended 1-1-84)

## TITLE 309. (Deleted 1-1-74)
See Title 112

## TITLE 310. (Deleted 1-1-74)
See Title 106

## TITLE 311. (Deleted 1-1-71)
See Title 111

## PART IV

## TITLE 400. INTERIM NEGOTIATIONS

**400.1**   From time to time during the term of this Agreement, grievances which have been timely filed concerning the interpretation and application of the provisions of this Agreement may be "Suspended" pursuant to the provisions of a Letter Agreement dated November 1, 1973, as amended March 8, 1974. Additionally, Company and Union may agree to enter into interim negotiations to clarify, modify, add to, or delete from the provisions of this Agreement. This Title authorizes the establishment of Ad Hoc Negotiating Committees from time to time to resolve such disputes. (Amended 1-1-94)

**400.2**   An Ad Hoc Negotiating Committee established by this Title shall be composed of members appointed by Union and members appointed by Company's Manager of Industrial Relations. Each party may appoint any number of members who they deem best suited to resolve the particular dispute before the Committee. The members appointed by each, however, shall be kept to a reasonable number consistent with the principles of effective bargaining, and each shall appoint a spokesman from amongst those appointed to the Committee.
**400.3**   The time spent by Union's Committee members in conjunction with the purpose of this Title and who are employees of the Company shall be paid by Company, and Union shall reimburse Company for such expenditures in accordance with the provisions of the Letter Agreement dated July 6, 1977.

**400.4**   The Committee is authorized to settle the dispute referred to it and issue a final and binding decision thereto and to issue Letters of Agreement or Letters of Interpretation revising and adding to this Agreement where necessary to effectuate the Committee's settlement. Without such agreement, neither Party may implement any change to this Agreement unless specifically provided for in this Agreement. (Amended 1-1-94)

## PART V

## TITLE 500. TERM

### 500.1   TERM

This Agreement, having taken effect as of September 1, 1952, and having thereafter been amended from time to time shall continue in effect as further amended herein for the term of January 1, *2000* through December 31, *2002*, and shall continue thereafter from year to year unless written notice of termination shall be given by either party to the other 60 days prior to the end of the then current term. (Amended 1-1-*00*)

| CLASSIFICATION | | PROGRESSION | RATES EFFECTIVE | | |
|---|---|---|---|---|---|
| | | | 1-1-2000 | 1-1-2001 | 1-1-2002 |
| 1376 | Senior Meter/Regulator Mechanic | | 992.95 | 1022.75 | 1053.45 |

## GENERAL SERVICES DEPARTMENT

### GARAGE

| | | | | | |
|---|---|---|---|---|---|
| 1258 | Apprentice Equipment Mechanic | | | | |
| | | Start | 883.65 | 910.20 | 937.55 |
| | | End 6 Mo | 904.75 | 931.90 | 959.90 |
| | | End 1 Yr | 925.25 | 953.05 | 981.65 |
| | | End 18 Mo | 950.85 | 979.40 | 1008.80 |
| | | End 2 Yr | 975.00 | 1004.25 | 1034.40 |
| | | End 30 Mo | 1000.80 | 1030.85 | 1061.80 |
| 1255 | Equipment Mechanic | | | | |
| 1252 | Utility Equipment Mechanic - Auberry | | | | |
| 1256 | Unassigned Equipment Mechanic | | 1118.55 | 1152.15 | 1186.75 |
| 1255 | Equipment Mechanic (DCPP) | | | | |
| 1254 | Utility Equipment Mechanic (DER) | | 1118.55 | 1152.15 | 1186.75 |
| | | Rate 1 | 1174.50 | 1209.80 | 1246.10 |
| | | Rate 2 | 1196.85 | 1232.80 | 1269.85 |
| | | Rate 3 | 1230.45 | 1267.40 | 1305.45 |

Rate 1 applies after being regularly headquartered at DCPP for 1 year.
Rate 2 applies after being regularly headquartered at DCPP for 2 years
Rate 3 applies after being regularly headquartered at DCPP for 3 years.

| | | | | | |
|---|---|---|---|---|---|
| 0060 | Garage Attendant - General Office | | | | |
| | | Start | 897.55 | 924.50 | 952.25 |
| | | End 6 Mo | 911.40 | 938.75 | 966.95 |
| | | End 1 Yr | 932.60 | 960.60 | 989.45 |
| 0730 | Garage Subforeman | | 1170.00 | 1205.10 | 1241.25 |
| 0733 | Garage Subforeman (DCPP) | | 1170.00 | 1205.10 | 1241.25 |
| | | Rate 1 | 1228.50 | 1265.40 | 1303.35 |
| | | Rate 2 | 1251.90 | 1289.50 | 1328.15 |
| | | Rate 3 | 1287.00 | 1325.65 | 1365.40 |

Rate 1 applies after being regularly headquartered at DCPP for 1 year.
Rate 2 applies after being regularly headquartered at DCPP for 2 years
Rate 3 applies after being regularly headquartered at DCPP for 3 years.

| | | | | | |
|---|---|---|---|---|---|
| 0880 | Garageman (Hired 1-1-88 and after) | | | | |
| | | Start | 619.85 | 638.45 | 657.60 |
| | | End 6 Mo | 697.95 | 718.90 | 740.50 |
| | | End 1 Yr | 775.65 | 798.95 | 822.95 |
| | | End 18 Mo | 853.60 | 879.25 | 905.65 |
| | | End 2 Yr | 872.00 | 898.20 | 925.15 |
| 0880 | Garageman (Hired 1-1-83 through 12-31-87) | | | | |
| | | Start | 708.50 | 729.80 | 751.70 |
| | | End 6 Mo | 779.35 | 802.75 | 826.85 |
| | | End 1 Yr | 853.60 | 879.25 | 905.65 |
| | | End 18 Mo | 872.00 | 898.20 | 925.15 |

| | | | RATES EFFECTIVE | | |
|---|---|---|---|---|---|
| CLASSIFICATION | | PROGRESSION | 1-1-2000 | 1-1-2001 | 1-1-2002 |
| 1574 | Lead Senior Gas Transmission Operator (When assigned to supervise four or more employees including themselves.) | | | | |
| | | Start | 1145.60 | 1180.00 | 1215.45 |
| | | End 1 Yr | 1198.60 | 1234.55 | 1271.60 |
| | Relief Lead Senior Gas Transmission Operator (When assigned to supervise four or more employees including themselves.) The appropriate rate of Lead Senior Gas Transmission Operator, plus $5.00 per week plus 8 times the hourly Sunday premium. | | | | |
| 1836 | Gas Supply Coordinator (PIO) | | | | |
| | | Start | 862.85 | 888.75 | 915.45 |
| | | End 6 Mo | 897.55 | 924.50 | 952.25 |
| | | End 1 Yr | 932.60 | 960.60 | 989.45 |
| | | End 18 Mo | 968.55 | 997.65 | 1027.60 |
| | | End 2 Yr | 1007.10 | 1037.35 | 1068.50 |
| | | End 30 Mo | 1046.35 | 1077.75 | 1110.10 |
| | | End 3 Yr | 1091.05 | 1123.80 | 1157.55 |
| | | End 42 Mo | 1141.50 | 1175.75 | 1211.05 |
| | Relief Gas Supply Coordinator The appropriate rate of Gas Supply Coordinator, plus $5.00 per week plus 8 times the hourly Sunday premium. | | | | |

STEAM GENERATION & NUCLEAR POWER GENERATION DEPARTMENTS
EXCEPT DIABLO CANYON POWER PLANT

OPERATING

Relief Operator or Engineer
The appropriate rate of the designated operating classification, plus $5.00 per week plus 8 times the hourly Sunday premium.

| | | | | | |
|---|---|---|---|---|---|
| 1592 | Assistant Control Operator - Avon, Martinez, Oleum | | | | |
| | | Start | 1020.80 | 1051.45 | 1083.00 |
| | | End 6 Mo | 1046.35 | 1077.75 | 1110.10 |
| 1589 | Assistant Control Operator - (Group I) Contra Costa, Humboldt Bay, Hunters Point, Morro Bay, Moss Landing, Pittsburg, Potrero | | | | |
| | | Start | 1033.45 | 1064.45 | 1096.40 |
| | | End 6 Mo | 1060.25 | 1092.10 | 1124.90 |
| 1718 | Assistant Power Plant Operator - Geysers (Hired 1-1-83 and after) | | | | |
| | | Start | 754.45 | 777.10 | 800.45 |
| | | End 6 Mo | 796.30 | 820.20 | 844.85 |
| | | End 1 Yr | 853.60 | 879.25 | 905.65 |
| | | End 18 Mo | 883.65 | 910.20 | 937.55 |
| | | End 2 Yr | 911.40 | 938.75 | 966.95 |
| | | End 30 Mo | 943.40 | 971.70 | 1000.85 |
| | | End 3 Yr | 983.00 | 1012.50 | 1042.90 |
| | | End 42 Mo | 1033.45 | 1064.45 | 1096.40 |

|  |  |  | RATES EFFECTIVE | |
|  |  | 1-1-2000 | 1-1-2001 | 1-1-2002 |
| CLASSIFICATION | PROGRESSION |  |  |  |
| 1718   Assistant Power Plant Operator - Geysers (Hired 12-31-82 and before) | | | | |
|  | Start | 804.05 | 828.20 | 853.05 |
|  | End 6 Mo | 821.45 | 846.10 | 871.50 |
|  | End 1 Yr | 853.60 | 879.25 | 905.65 |
|  | End 18 Mo | 883.65 | 910.20 | 937.55 |
|  | End 2 Yr | 911.40 | 938.75 | 966.95 |
|  | End 30 Mo | 943.40 | 971.70 | 1000.85 |
|  | End 3 Yr | 983.00 | 1012.50 | 1042.90 |
|  | End 42 Mo | 1033.45 | 1064.45 | 1096.40 |
| 1560   Auxiliary Operator (Hired 1-1-83 and after) | | | | |
|  | Start | 754.45 | 777.10 | 800.45 |
|  | End 6 Mo | 796.30 | 820.20 | 844.85 |
|  | End 1 Yr | 853.60 | 879.25 | 905.65 |
|  | End 18 Mo | 883.65 | 910.20 | 937.55 |
|  | End 2 Yr | 911.40 | 938.75 | 966.95 |
|  | End 30 Mo | 943.40 | 971.70 | 1000.85 |
| 1560   Auxiliary Operator (Hired 12-31-82 and before) | | | | |
|  | Start | 804.05 | 828.20 | 853.05 |
|  | End 6 Mo | 821.45 | 846.10 | 871.50 |
|  | End 1 Yr | 853.60 | 879.25 | 905.65 |
|  | End 18 Mo | 883.65 | 910.20 | 937.55 |
|  | End 2 Yr | 911.40 | 938.75 | 966.95 |
|  | End 30 Mo | 943.40 | 971.70 | 1000.85 |
| 1586   Control Operator - Avon, Martinez, Oleum | | | | |
|  | Start | 1067.60 | 1099.65 | 1132.65 |
|  | End 6 Mo | 1123.90 | 1157.65 | 1192.40 |
| 1585   Control Operator - (Group I) Contra Costa, Humboldt Bay, Hunters Point, Morro Bay, Moss Landing, Pittsburg, Potrero | | | | |
|  | Start | 1091.05 | 1123.80 | 1157.55 |
|  | End 6 Mo | 1149.60 | 1184.10 | 1219.65 |
| 1050   Janitor (Hired 1-1-88 and after) 1060   Janitress (Hired 1-1-88 and after) | | | | |
|  | Start | 619.85 | 638.45 | 657.60 |
|  | End 6 Mo | 684.25 | 704.80 | 725.95 |
|  | End 1 Yr | 748.45 | 770.90 | 794.05 |
|  | End 18 Mo | 812.80 | 837.20 | 862.35 |
| 1050   Janitor (Hired 1-1-83 through 12-31-87) 1060   Janitress (Hired 1-1-83 through 12-31-87) | | | | |
|  | Start | 708.50 | 729.80 | 751.70 |
|  | End 6 Mo | 759.95 | 782.75 | 806.25 |
|  | End 1 Yr | 812.80 | 837.20 | 862.35 |
| 1050   Janitor (Hired 12-31-82 and before) 1060   Janitress (Hired 12-31-82 and before) | | | | |
|  | Start | 754.40 | 777.05 | 800.40 |
|  | End 6 Mo | 783.90 | 807.45 | 831.70 |
|  | End 1 Yr | 812.80 | 837.20 | 862.35 |
| 1716   Power Plant Operator - Geysers | | | | |
|  | Start | 1118.55 | 1152.15 | 1186.75 |
|  | End 6 Mo | 1141.50 | 1175.75 | 1211.05 |

| | | | RATES EFFECTIVE | | |
|---|---|---|---|---|---|
| CLASSIFICATION | | PROGRESSION | 1-1-2000 | 1-1-2001 | 1-1-2002 |
| 1717 | Power Plant Operator - Oakland | | | | |
| | | Start | 1067.60 | 1099.65 | 1132.65 |
| | | End 6 Mo | 1123.90 | 1157.65 | 1192.40 |
| 1580 | Senior Control Operator - (Group I) Contra Costa, Humboldt Bay, Hunters Point, Morro Bay, Moss Landing, Pittsburg, Potrero. | | 1184.35 | 1219.90 | 1256.50 |
| 1725 | Senior Power Plant Operator - Geysers | | 1198.60 | 1234.60 | 1271.65 |
| 0505 | Steam Heat Engineer Station "S" - San Francisco | | | | |
| | | Start | 983.00 | 1012.50 | 1042.90 |
| | | End 6 Mo | 1020.80 | 1051.45 | 1083.00 |
| 0506 | Steam Heat Engineer Station "T" - San Francisco | | | | |
| | | Start | 1033.45 | 1064.45 | 1096.40 |
| | | End 6 Mo | 1060.25 | 1092.10 | 1124.90 |
| | ELECTRICAL MAINTENANCE | | | | |
| 0482 | Apprentice Electrician | | | | |
| | | Start | 862.85 | 888.75 | 915.45 |
| | | End 6 Mo | 872.00 | 898.20 | 925.15 |
| | | End 1 Yr | 897.55 | 924.50 | 952.25 |
| | | End 18 Mo | 917.20 | 944.75 | 973.10 |
| | | End 2 Yr | 975.00 | 1004.25 | 1034.40 |
| | | End 30 Mo | 1000.80 | 1030.85 | 1061.80 |
| 0749 | Electrical Maintenance Subforeman | | | | |
| | | Start | 1170.00 | 1205.10 | 1241.25 |
| | | End 1 Yr | 1198.60 | 1234.60 | 1271.65 |
| 0468 | Electrician | | | | |
| 0485 | Unassigned Electrician | | | | |
| 0477 | Traveling Electrician | | | | |
| 0476 | Unassigned Traveling Electrician | | 1118.55 | 1152.15 | 1186.75 |
| 0943 | Utility Worker (Hired 1-1-88 and after) | | | | |
| 0942 | Traveling Utility Worker (Hired 1-1-88 and after) | Start | 619.85 | 638.45 | 657.60 |
| | | End 6 Mo | 697.95 | 718.90 | 740.50 |
| | | End 1 Yr | 775.65 | 798.95 | 822.95 |
| | | End 18 Mo | 853.60 | 879.25 | 905.65 |
| 0943 | Utility Worker (Hired 1-1-83 through 12-31-87) | | | | |
| 0942 | Traveling Utility Worker (Hired 1-1-83 through 12-31-87) | Start | 708.50 | 729.80 | 751.70 |
| | | End 6 Mo | 779.35 | 802.75 | 826.85 |
| | | End 1 Yr | 853.60 | 879.25 | 905.65 |
| 0943 | Utility Worker (Hired 12-31-82 and before) | | | | |
| 0942 | Traveling Utility Worker (Hired 12-31-82 and before) | Start | 754.40 | 777.05 | 800.40 |
| | | End 6 Mo | 804.05 | 828.20 | 853.05 |
| | | End 1 Yr | 853.60 | 879.25 | 905.65 |

| | | | RATES EFFECTIVE | | |
|---|---|---|---|---|---|
| CLASSIFICATION | | PROGRESSION | 1-1-2000 | 1-1-2001 | 1-1-2002 |
| | MECHANICAL MAINTENANCE | | | | |
| 1131 | Apprentice Machinist | | | | |
| | | Start | 862.85 | 888.75 | 915.45 |
| | | End 6 Mo | 872.00 | 898.20 | 925.15 |
| | | End 1 Yr | 897.55 | 924.50 | 952.25 |
| | | End 18 Mo | 917.20 | 944.75 | 973.10 |
| | | End 2 Yr | 975.00 | 1004.25 | 1034.40 |
| | | End 30 Mo | 1000.80 | 1030.85 | 1061.80 |
| 2171 | Apprentice Mechanic - Rigger | | | | |
| | | Start | 862.85 | 888.75 | 915.45 |
| | | End 6 Mo | 872.00 | 898.20 | 925.15 |
| | | End 1 Yr | 897.55 | 924.50 | 952.25 |
| | | End 18 Mo | 917.20 | 944.75 | 973.10 |
| | | End 2 Yr | 975.00 | 1004.25 | 1034.40 |
| | | End 30 Mo | 1000.80 | 1030.85 | 1061.80 |
| 2629 | Apprentice Welder | | | | |
| | | Start | 862.85 | 888.75 | 915.45 |
| | | End 6 Mo | 872.00 | 898.20 | 925.15 |
| | | End 1 Yr | 897.55 | 924.50 | 952.25 |
| | | End 18 Mo | 917.20 | 944.75 | 973.10 |
| | | End 2 Yr | 975.00 | 1004.25 | 1034.40 |
| | | End 30 Mo | 1000.80 | 1030.85 | 1061.80 |
| 2626 | Certified Welder | | | | |
| 2623 | Unassigned Certified Welder | | | | |
| 2637 | Traveling Certified Welder | | | | |
| 2636 | Unassigned Traveling Certified Welder | | 1118.55 | 1152.15 | 1186.75 |
| 0150 | Launch Captain - Moss Landing Power Plant | | 1118.55 | 1152.15 | 1186.75 |
| 0426 | Light Truck Driver | | | | |
| | | Start | 872.00 | 898.20 | 925.15 |
| | | End 6 Mo | 897.55 | 924.50 | 952.25 |
| 1111 | Machinist | | | | |
| 1126 | Unassigned Machinist | | | | |
| 1147 | Traveling Machinist | | | | |
| 1124 | Unassigned Traveling Machinist | | 1118.55 | 1152.15 | 1186.75 |
| 0753 | Maintenance Subforeman | | | | |
| | | Start | 1170.00 | 1205.10 | 1241.25 |
| | | End 1 Yr | 1198.60 | 1234.60 | 1271.65 |
| 2173 | Mechanic - Rigger | | | | |
| 2175 | Unassigned Mechanic - Rigger | | | | |
| 2170 | Traveling Mechanic - Rigger | | | | |
| 2172 | Unassigned Traveling Mechanic - Rigger | | 1118.55 | 1152.15 | 1186.75 |
| 2167 | Traveling Rigger (Incumbent only) | | | | |
| 2164 | Unassigned Traveling Rigger (Incumbent only) | | 1118.55 | 1152.15 | 1186.75 |
| 0330 | Tool Clerk | | 872.00 | 898.20 | 925.15 |

| CLASSIFICATION | | PROGRESSION | RATES EFFECTIVE | | |
|---|---|---|---|---|---|
| | | | 1-1-2000 | 1-1-2001 | 1-1-2002 |
| 0940 | Utility Worker (Hired 1-1-88 and after) | | | | |
| 0963 | Traveling Utility Worker (Hired 1-1-88 and after) | | | | |
| | | Start | 619.85 | 638.45 | 657.60 |
| | | End 6 Mo | 697.95 | 718.90 | 740.50 |
| | | End 1 Yr | 775.65 | 798.95 | 822.95 |
| | | End 18 Mo | 853.60 | 879.25 | 905.65 |
| 0940 | Utility Worker (Hired 1-1-83 through 12-31-87) | | | | |
| 0963 | Traveling Utility Worker (Hired 1-1-83 through 12-31-87) | | | | |
| | | Start | 708.50 | 729.80 | 751.70 |
| | | End 6 Mo | 779.35 | 802.75 | 826.85 |
| | | End 1 Yr | 853.60 | 879.25 | 905.65 |
| 0940 | Utility Worker (Hired 12-31-82 and before) | | | | |
| 0963 | Traveling Utility Worker (Hired 12-31-82 and before) | | | | |
| | | Start | 754.40 | 777.05 | 800.40 |
| | | End 6 Mo | 804.05 | 828.20 | 853.05 |
| | | End 1 Yr | 853.60 | 879.25 | 905.65 |
| 2620 | Welder | | 1033.45 | 1064.45 | 1096.40 |
| | TECHNICAL MAINTENANCE | | | | |
| 2398 | Apprentice Control Technician | | | | |
| | | Start | 1000.80 | 1030.85 | 1061.80 |
| | | End 6 Mo | 1029.20 | 1060.10 | 1091.90 |
| | | End 1 Yr | 1046.35 | 1077.75 | 1110.10 |
| | | End 18 Mo | 1074.90 | 1107.15 | 1140.40 |
| | | End 2 Yr | 1118.55 | 1152.15 | 1186.75 |
| 2091 | Apprentice Instrument Repairman | | | | |
| | | Start | 862.85 | 888.75 | 915.45 |
| | | End 6 Mo | 872.00 | 898.20 | 925.15 |
| | | End 1 Yr | 897.55 | 924.50 | 952.25 |
| | | End 18 Mo | 917.20 | 944.75 | 973.10 |
| | | End 2 Yr | 975.00 | 1004.25 | 1034.40 |
| | | End 30 Mo | 1000.80 | 1030.85 | 1061.80 |
| 2397 | Control Technician | | | | |
| 2383 | Unassigned Control Technician | | | | |
| 2396 | Traveling Control Technician | | | | |
| 2394 | Unassigned Traveling Control Technician | | 1184.35 | 1219.90 | 1256.50 |
| 3260 | Chemical Technologist | | | | |
| | | Start | 787.70 | 811.35 | 835.70 |
| | | End 6 Mo | 819.10 | 843.70 | 869.05 |
| | | End 1 Yr | 851.85 | 877.45 | 903.80 |
| | | End 18 Mo | 885.90 | 912.50 | 939.90 |
| | | End 2 Yr | 921.30 | 948.95 | 977.45 |
| | | End 30 Mo | 958.30 | 987.05 | 1016.70 |
| | | End 3 Yr | 996.65 | 1026.55 | 1057.35 |
| | | End 42 Mo | 1036.50 | 1067.60 | 1099.65 |
| | | End 4 Yr | 1078.05 | 1110.40 | 1143.75 |
| | | End 54 Mo | 1119.30 | 1152.90 | 1187.50 |
| 1503 | Environmental Protection Monitor - Geysers | | | | |
| | | Start | 897.55 | 924.50 | 952.25 |
| | | End 6 Mo | 968.55 | 997.65 | 1027.60 |
| | | End 1 Yr | 1039.85 | 1071.05 | 1103.20 |

| CLASSIFICATION | PROGRESSION | RATES EFFECTIVE | | |
|---|---|---|---|---|
| | | 1-1-2000 | 1-1-2001 | 1-1-2002 |
| 2090 Instrument Repairman | | | | |
| 2093 Unassigned Instrument Repairman | | | | |
| 2097 Traveling Instrument Repairman | | | | |
| 2094 Unassigned Traveling Instrument Repairman | | 1118.55 | 1152.15 | 1186.75 |
| 1505 Radiation and Process Monitor (HBPP) | | | | |
| 1506 Traveling Radiation and Process Monitor (HBPP) | Start | 897.55 | 924.50 | 952.25 |
| | End 6 Mo | 968.55 | 997.65 | 1027.60 |
| | End 1 Yr | 1039.85 | 1071.05 | 1103.20 |
| | End 18 Mo | 1119.30 | 1152.90 | 1187.50 |
| 0944 Utility Worker (Hired 1-1-88 and after) | | | | |
| 0946 Traveling Utility Worker (Hired 1-1-88 and after) | Start | 619.85 | 638.45 | 657.60 |
| | End 6 Mo | 697.95 | 718.90 | 740.50 |
| | End 1 Yr | 775.65 | 798.95 | 822.95 |
| | End 18 Mo | 853.60 | 879.25 | 905.65 |
| 0944 Utility Worker (Hired 1-1-83 through 12-31-87) | | | | |
| 0946 Traveling Utility Worker (Hired 1-1-83 through12-31-87) | Start | 708.50 | 729.80 | 751.70 |
| | End 6 Mo | 779.35 | 802.75 | 826.85 |
| | End 1 Yr | 853.60 | 879.25 | 905.65 |
| 0944 Utility Worker (Hired 12-31-82 and before) | | | | |
| 0946 Traveling Utility Worker (Hired 12-31-82 and before) | Start | 754.40 | 777.05 | 800.40 |
| | End 6 Mo | 804.05 | 828.20 | 853.05 |
| | End 1 Yr | 853.60 | 879.25 | 905.65 |
| CLERICAL | | | | |
| 0293 First Plant Clerk | Start | 932.60 | 960.60 | 989.45 |
| | End 6 Mo | 950.85 | 979.40 | 1008.80 |
| | End 1 Yr | 983.00 | 1012.50 | 1042.90 |
| | End 18 Mo | 1007.10 | 1037.35 | 1068.50 |
| | End 2 Yr | 1023.40 | 1054.10 | 1085.75 |
| 0294 Routine Plant Clerk (Hired 1-1-88 and after) | Start | 619.85 | 638.45 | 657.60 |
| | End 6 Mo | 704.10 | 725.25 | 747.05 |
| | End 1 Yr | 788.05 | 811.70 | 836.05 |
| | End 18 Mo | 872.00 | 898.20 | 925.15 |
| | End 2 Yr | 897.55 | 924.50 | 952.25 |
| | End 30 Mo | 932.60 | 960.60 | 989.45 |
| 0294 Routine Plant Clerk (Hired 1-1-83 through 12-31-87) | Start | 708.50 | 729.80 | 751.70 |
| | End 6 Mo | 787.90 | 811.55 | 835.90 |
| | End 1 Yr | 872.00 | 898.20 | 925.15 |
| | End 18 Mo | 897.55 | 924.50 | 952.25 |
| | End 2 Yr | 932.60 | 960.60 | 989.45 |

|  |  |  | RATES EFFECTIVE | | |
| --- | --- | --- | --- | --- | --- |
| CLASSIFICATION | | PROGRESSION | 1-1-2000 | 1-1-2001 | 1-1-2002 |
| 0294 | Routine Plant Clerk (Hired 12-31-82 and before) | | | | |
|  |  | Start | 754.40 | 777.05 | 800.40 |
|  |  | End 6 Mo | 812.80 | 837.20 | 862.35 |
|  |  | End 1 Yr | 872.00 | 898.20 | 925.15 |
|  |  | End 18 Mo | 897.55 | 924.50 | 952.25 |
|  |  | End 2 Yr | 932.60 | 960.60 | 989.45 |
| 0290 | Senior Plant Clerk | | | | |
|  |  | Start | 1023.40 | 1054.10 | 1085.75 |
|  |  | End 6 Mo | 1046.35 | 1077.75 | 1110.10 |
|  |  | End 1 Yr | 1067.60 | 1099.65 | 1132.65 |
|  |  | End 18 Mo | 1091.05 | 1123.80 | 1157.55 |

## NUCLEAR POWER GENERATION DEPARTMENT
## DIABLO CANYON POWER PLANT

OPERATING

Relief Operator or Engineer
The appropriate rate of the designated operating classification, plus
$5.00 per week plus 8 times the hourly Sunday premium

| 1583 | Control Operator (DCPP) | | 1264.60 | 1302.55 | 1341.65 |
| --- | --- | --- | --- | --- | --- |
| 1050 | Janitor (DCPP) (Hired 1-1-88 and after) | | | | |
| 1060 | Janitress (DCPP) (Hired 1-1-88 and after) | | | | |
|  |  | Start | 660.20 | 680.05 | 700.45 |
|  |  | End 6 Mo | 711.05 | 732.40 | 754.40 |
|  |  | End 1 Yr | 761.90 | 784.80 | 808.35 |
|  |  | End 18 Mo | 812.80 | 837.20 | 862.35 |
| 1050 | Janitor (DCPP) (Hired 12-31-87 and before) | | | | |
| 1060 | Janitress (DCPP) (Hired 12-31-87 and before) | | | | |
|  |  | Start | 754.40 | 777.05 | 800.40 |
|  |  | End 6 Mo | 783.90 | 807.45 | 831.70 |
|  |  | End 1 Yr | 812.80 | 837.20 | 862.35 |
| 1699 | Nuclear Operator | | | | |
|  |  | Start | 862.85 | 888.75 | 915.45 |
|  |  | End 6 Mo | 872.00 | 898.20 | 925.15 |
|  |  | End 1 Yr | 897.55 | 924.50 | 952.25 |
|  |  | End 18 Mo | 927.85 | 955.70 | 984.40 |
|  |  | End 2 Yr | 975.00 | 1004.25 | 1034.40 |
|  |  | End 30 Mo | 1000.80 | 1030.85 | 1061.80 |
|  |  | End 42 Mo | 1105.80 | 1139.00 | 1173.20 |
|  |  | End 54 Mo | 1210.20 | 1246.55 | 1283.95 |
| 1582 | Senior Control Operator (DCPP) | | 1302.80 | 1341.90 | 1382.15 |
| 0928 | Utility Worker - Operating - (DCPP) (Incumbent only) | | | | |
|  |  | Start | 660.20 | 680.05 | 700.45 |
|  |  | End 6 Mo | 724.75 | 746.50 | 768.90 |
|  |  | End 1 Yr | 789.25 | 812.95 | 837.35 |
|  |  | End 18 Mo | 853.60 | 879.25 | 905.65 |

**EXHIBIT B**

# R3-97-53-PGE

April 14, 1997

Local Union No. 1245
International Brotherhood of
Electrical Workers, AFL-CIO
P.O. Box 4790
Walnut Creek, CA  94598

Attention:  Mr. Jack McNally, Business Manager

Gentlemen:

On December 20, 1995, the California Public Utilities Commission (CPUC) issued its electric industry restructuring policy decision which, among other things, ordered PG&E to voluntarily divest at least 50 percent of their fossil generation. In compliance with the CPUC order, PG&E filed its response on March 19, 1996, stating that it would sell at least 50 percent of its fossil generation and would evaluate the possibilities of selling all generation except nuclear.

In August 1996, the California Legislature passed Assembly Bill 1890 which included provisions that apply to the sale of utility electric generating facilities. Specifically, the bill requires that any facility sold by a utility must continue to be operated and maintained by the utility or an affiliate under contract to the new owner for a period of two years following the sale. The legislation also specifies that reasonable costs associated with "...voluntary severance, retraining, early retirement, outplacement, and related benefits" due to plant sale are to be recovered through Competitive Transition Charges (CTC).

On October 22, 1996, the Company announced its intention to sell four plants which represent 50 percent of its fossil-fueled generation.

The sale of these facilities could take several years. During the transition period of the sale and the subsequent two-year operations and maintenance contract, PG&E has the obligation to operate the plants safely and reliably. To accomplish this, PG&E will need highly skilled personnel who are knowledgeable about the plants' operation.

Local Union No. 1245, IBEW         -2-         April 14, 1997
R3-97-53-PGE

The Company and Union met through Ad Hoc Negotiations to address the transition issues. The Company Committee consisted of Jim Randolph, Mel Bradley, Terry Nelson, Randy Livingston, Gloria Herrera, Dave Bergman, Sabrina Danels and John Moffat. The Union Committee consisted of Darrel Mitchell, Ken Ball, Sam Tamimi, Bill Butkovich, Robin David, Wayne Fippin, Dan Lockwood, Al MacLean, Larry Magnoli, Jim Martinez, Mike McBroom and Wayne Pacheco.

The Company's and Union's Power Generation bargaining committee reached an agreement on March 8, 1997 on the following items related to power plant sales. This agreement applies to Title 200 Steam Generation (except Diablo Canyon but including Humboldt Bay PP) and Hydro Generation employees. The agreement is as follows:

### Application Trigger:

The trigger for these provisions will be the formal approval by the CPUC of the process tied to the sale of a generating facility. All of these provisions will only be applicable to that facility that has been approved for sale. In the event of a partial sale, Company and Union will meet prior to the filing to determine which employees are covered by this Agreement. If, after the determination is made, it is found during subsequent 206 activity that other employees are impacted by the divestiture sale, they will be entitled to the provisions outlined in this Agreement on a retroactive basis. This agreement is subject to the provisions of Title 102 for the determination of covered employees.

### Early Retirement Program:

Eligible employees who are 50 years of age or older will be given five additional years of service or age or a combination of age and service under the provisions of the Retirement Plan as outlined in the current Benefit Agreement. Special Provision P will apply to any plant covered under the application trigger above. Employee Severance and Displacement Program payments are not considered "benefits" in Section II (iii) of Special Provision P. Attachment 1 is Special Provision P.

### Modification to Section 207.2 of the Agreement:

It is recognized that the Company has the right to have work performed by outside contractors. In the exercise of such right, Company will not make a contract with any firm for the sole purpose of dispensing with the service of Generation employees who are engaged in the maintenance, operations and construction work. Prior to contracting, where practical, Company will use hiring hall employees.

Once a plant has received formal CPUC approval of the process to be sold thereby triggering the provisions in this letter agreement, the Company will not layoff in the department if the department is contracting work normally performed by the bargaining unit.

The Company shall be able to reduce through attrition even if contracting is occurring.

(Subsections b and c of Section 207.2 of the Agreement would no longer be applicable)

Flexibility Committee:

Each Plant through their Local Title 8 Committee will attempt to develop a recommended workforce flexibility plan. These plans will address cross crafting, work schedules and job assignments. Once the plans are agreed to, each of the Local Title 8 committees will be responsible to review and recommend amendments, and updates. Any modifications to the collective bargaining agreement will require a letter agreement signed by the Company's Chief Negotiator and the Union's Business Manager.

Enhanced Relocation (206.8):

The Company proposes to provide these employees who must relocate to secure an employment opportunity with reimbursement for moving expenses as defined in Section 206.8 of the Physical Agreement up to a maximum of $5,000.

Reemployment Provisions (206.13):

Modify 206.13 (a) as follows:

Notwithstanding any other provision of this Agreement a regular employee who has been laid off for lack of work pursuant to the provisions of this Agreement for a period not in excess of <u>sixty months</u> and who had one or more years of Service at the time of layoff.

Successor Clause:

Company as a condition of any sales agreement for generating assets will obtain from the new entity that it will, only to the extent the new entity is required under federal labor law:

(a)  recognize local 1245 as the collective bargaining representative of all employees covered by local 1245 at that facility;

(b)  execute a written assumption of section 2.1 of local 1245 physical collective bargaining agreement.

To comply fully with its obligation set forth in the preceding sentence, the Company is only required to include the following language in any sales agreement for generating assets:

Purchaser agrees to recognize, subject to the requirements of federal labor laws, Local 1245 of the International Brotherhood of Electrical Workers, AFL-CIO ("Union"), as the exclusive bargaining representative of those employees hired by Purchaser who were subject to Section 2.1 of the collective bargaining agreement between Seller and Union. Purchaser further agrees to defend and indemnify Seller against any claim arising out of an alleged failure of Purchaser, for any reason, to comply with the foregoing recognition requirement.

The only claim the Union may have against the Company under this Section is for the Company's failure to include in the sales agreement the clause set forth above. Should the Company fail to include in the sales agreement the clause set forth above, the Company will be liable for the difference in wages and benefits from the conclusion of the O&M Agreement up to the end of the term of the Physical Collective Bargaining Agreement, which was in effect between the Company and Local 1245 at the end of the O&M Agreement. If the purchaser fails to recognize the Union, or the recognition obligation, for any reason, is alleged or found to be unenforceable or unlawful, the Union will have no claim against the Company.

## Notice of Displacement  (Section 206.2)

Employees working at an impacted plant will be provided notice of displacement without options six months prior to the end of the Company's operation and maintenance obligation. Any Section 206.2 notice given prior to six months, will include options. Section 206.2 notice with options will be provided prior to the completion of the O&M obligation. Positions filled with Hiring Hall employees in the same line of progression will be offered as voluntary displacement options in addition to the normal 206 options.

## Wage Protection:

Employees who vacate their base position and successfully bid, transfer or are displaced into a lower paying regular position in another department or another line of progression will maintain their rate of pay for up to three years or until such time as the rate of pay in the new position is equal to or greater than that of the employee's frozen rate of pay, whichever comes first. If at the end of three years, an employee is still paid above the top of the rate for the classification held, the employee will be placed at the top of the rate for that classification. During the time that an employee's pay remains above the wage range of the position into which he/she bid, the employee will not receive General Wage Increases or Progressive Wage Increases.

## Retraining Assistance:

After successful completion of an approved course, a refund of 100% of the direct cost will be made up to a cap of $5,000 per year while employed and $5,000 for the year immediately following separation from the Company for eligible employees. Attachment 2 delineates the program.

## Employee Severance and Displacement Program:

Following approval by the CPUC of the process to sell a power plant, eligible bargaining unit employees will receive annual lump sum payments of $10,000 for the first two years, $15,000 for the third year, and the final payment of $50,000 once the two-year O&M obligation has been completed or if an employee has been displaced through the 206 process. In any event the final payment will be $50,000. Details regarding eligibility are in Attachment 3.



Local Union No. 1245, IBEW -5- April 14, 1997
R3-97-53-PGE

## Placement Opportunities:

Parties recognize the 94-53 Employment Retention Committee will continue to address placement issues also recognizing the Company may place impacted employees pursuant to subsection 205.5(c).

## Joint Overview Committee:

Company and Union agree to establish a joint committee to address implementation issues as a result of this agreement.

If you are in accord with the foregoing and agree thereto, please so indicate in the space provided and return one executed copy of this letter to the Company.

Very truly yours,

PACIFIC GAS & ELECTRIC COMPANY

By: _____
     Chief Negotiator

The Union is in accord with the foregoing and agrees thereto as of the date hereof.

_____, 1997     By: _____
                                         Business Manager

# EXHIBIT C



## SEVERANCE AGREEMENT AND RELEASE

This Severance Agreement and Release is made and entered into between Mr. THOMAS KNOWLES and the Pacific Gas and Electric Company (PG&E). Mr. KNOWLES and PG&E (collectively referred to as "the parties"), in their wish to compromise, resolve, settle, and terminate any dispute or claim between them with respect to Mr. KNOWLES employment with PG&E and severance therefrom, have agreed as follows:

1.  Effective close of business, 5/7/2001 Mr. KNOWLES was laid off from PG&E employment.

2.  Within fourteen (14) calendar days after the effective date of this Severance Agreement and Release as determined in accordance with paragraph 14 of this agreement, PG&E shall pay to Mr. KNOWLES the amount of $58,183.24, less applicable deductions. Mr. KNOWLES understands he/she is responsible for paying any taxes on the amount paid to him/her pursuant to this Severance Agreement and Release. The parties understand and agree that the payment provided in this paragraph is in addition to, and does not affect, any payment and benefit to which Mr. KNOWLES may be otherwise entitled under PG&E's compensation, performance incentive, stock option, and other benefit programs.

3.  Mr. KNOWLES represents that he/she does not have any pending claim, charge or action in or with any federal, state or local court or any administrative agency against PG&E, its officers, attorneys, agents, employees, subsidiaries, parent company, and affiliated companies.

4.  In consideration for the payment which PG&E shall provide Mr. KNOWLES under this Severance Agreement and Release, Mr. KNOWLES in behalf of his/herself, his/her heirs, estate, executors, administrators, successors, and assigns, releases and agrees to hold harmless PG&E, its officers, attorneys, agents, employees, assigns, subsidiaries, parent company, affiliated companies, and successors, from all actions, causes of action, claims, disputes, judgments, obligations, damages, liabilities of whatsoever kind and character, relating to Mr. KNOWLES employment with PG&E, including his/her employment severance and any action which led to the severance. Specifically, Mr. KNOWLES understands and agrees that the actions, causes of action, claims, disputes, judgments, obligations, damages, and liabilities covered by the preceding sentence include, but are not limited to, those arising under any federal, state, or local law, regulation, or order relating to civil rights (including employment discrimination on the basis of race, color, religion, age, sex, national origin, ancestry, physical handicap, medical condition, veteran status, marital status, and sexual orientation), wage and hour, labor, contract, or tort.

5.  Mr. KNOWLES understands and agrees that this Severance Agreement and Release extends to all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, past or present, and all rights under Section 1542 of the California Civil Code are his/hereby expressly waived. Such section reads as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his/her favor at the time of executing the release, which if known to his/her must have materially affected his/her settlement with the debtor.

6.    Mr. KNOWLES agrees not to initiate, participate or aid, in any way, in any lawsuit or proceeding upon any claim released by him/her under this Severance Agreement and Release. Mr. KNOWLES understands and agrees that, if he/she violates his/her promise in the preceding sentence, he/she has engaged in a material breach of this Severance Agreement and Release. This paragraph, however, shall not prohibit Mr. KNOWLES from participating in an Equal Employment Opportunity Commission investigation or proceeding, if subpoenaed to do so by the Equal Employment Opportunity Commission. PG&E acknowledges that Mr. KNOWLES may be legally required to appear and testify at a deposition, court hearing or trial, or otherwise respond to a subpoena. In the event of any such request, Mr. KNOWLES shall notify PG&E Human Resources of such request.

7.    Mr. KNOWLES represents and agrees that prior to signing this Severance Agreement and Release, he/she returned to PG&E all originals and copies of all files, memoranda, records, software, credit cards, identification cards, keys, and any other property of PG&E or its affiliates which he/she had in his/her possession, custody or control.

8.    Mr. KNOWLES agrees not to use, disclose, publicize, or circulate any secret, confidential or proprietary information concerning PG&E, its subsidiaries, parent company, or affiliates, which has come to his/her attention during his/her employment with PG&E, unless his/her doing so is consistent with any rights he/she may have under any applicable whistleblower laws, is authorized in writing by PG&E's Human Resources Department or is required by law, including subpoena. Before making any legally-required disclosure, Mr. KNOWLES shall give PG&E as much advance notice as possible. Mr. KNOWLES further agrees that his/her violation of this paragraph shall constitute a material breach of this Severance Agreement and Release.

9.    Mr. KNOWLES agrees that, if called upon to do so, he/she will cooperate with, and provide reasonable assistance to, PG&E to protect and further its lawful interests in all judicial, administrative, investigative, and legislative proceedings involving PG&E or any aspect of its operations. The parties agree that this paragraph does not affect Mr. KNOWLES's legitimate exercise of his/her rights under applicable whistleblower laws or his/her obligation to comply with all validly-issued court or administrative orders, including subpoenas. Mr. KNOWLES further agrees that his/her violation of this paragraph shall constitute a material breach of this Severance Agreement and Release.

10. Mr. KNOWLES understands and agrees that if he/she engages, or has engaged, in misconduct that would warrant his/her termination of employment under PG&E's employee conduct standards and the collective bargaining agreement's just cause standard, he/she shall forfeit his/her right to sign this Severance Agreement and Release.

11. Any dispute regarding any aspect of this Severance Agreement and Release, including its validity, interpretation, or any action which would constitute a violation of this Severance Agreement and Release (hereinafter referred to as an "arbitrable dispute") shall be resolved by an experienced arbitrator, selected by the parties in accordance with the rules of the American Arbitration Association. The fees of the arbitrator and the cost associated with producing a transcript of the proceedings shall be paid in equal shares by Mr. KNOWLES and PG&E. The parties agree that arbitration shall be the exclusive remedy for resolving arbitrable disputes and that the decision of the arbitrator shall be final and binding. The judgment rendered by the arbitrator on any award may be entered in any court having competent jurisdiction. The parties agree that this paragraph shall not apply to the lawful exercise of any right Mr. KNOWLES may have under the Age Discrimination and Employment Act and that such matters shall be governed by the provisions of said Act.

Mr. KNOWLES understands and agrees that, if he/she initiates a proceeding, other than an arbitration proceeding as described above, to set aside or challenge the validity of this Severance Agreement and Release, he/she shall repay to PG&E the payment he received under this Severance Agreement and Release concurrent with his/her initiation of the proceeding. Mr. KNOWLES's failure to make the prescribed repayment shall be a basis for rejecting his attempt to set aside or challenge the validity of this Severance Agreement and Release. Mr. KNOWLES further understands and agrees that, if his/her attempt to set aside or challenge the validity of this Severance Agreement and Release is rejected, he/she shall pay to PG&E any loss, cost, damage, or expense, including, without limitation, attorney's fees PG&E incurred in the proceeding, within seven (7) calendar days from the final decision rejecting his/her attempt. Further, not withstanding the foregoing, if Mr. KNOWLES obtains against a monetary judgment or settlement against PG&E for a claim released by him/her under this Severance Agreement and Release, the payment he/she received under this Agreement shall be deducted from any such judgment or settlement. The parties agree that this paragraph shall not apply to the lawful exercise of any right Mr. KNOWLES may have under the Age Discrimination and Employment Act and that such matters shall be governed by the provisions of said Act.

12. Mr./Ms. KNOWLES agrees that, if he/she engages in a material breach of this Severance Agreement and Release, he/she shall repay to PG&E the payment he/she received under this Severance Agreement and Release within seven (7) calendar days upon written demand by PG&E. The parties agree that this paragraph shall not apply to the lawful exercise of any right Mr. KNOWLES may have under the Age Discrimination and Employment Act and that such matters shall be governed by the provisions of said Act.

13. This Severance Agreement and Release shall not be considered an admission of liability or a violation of any applicable contract, law, rule, regulation, or order of any kind.

14. Mr. KNOWLES understands and agrees that all claims he/she may have arising under the Age Discrimination in Employment Act before he/she signs this Severance Agreement and Release are covered by paragraphs 4 and 5 of this Severance Agreement and Release and that his/her waiver of those age discrimination claims is an integral part of the release aspect of this agreement. Therefore, consistent with the Older Workers Benefit Protection Act, Mr. KNOWLES states that he/she was informed that, when given this Severance Agreement and Release, he/she could take up to 45 calendar days to consider its provisions. Mr. KNOWLES was also advised that he/she may elect to sign this Severance Agreement and Release before the expiration of the 45-day consideration period, but is under no obligation to shorten the period. Mr. KNOWLES further understands that, if he/she signs this Severance Agreement and Release by affixing his/her signature and date in the "EMPLOYEE." "Social Security," and "DATE" sections of this agreement below, he/she may revoke it within seven (7) calendar days of the agreement's execution. To revoke this Severance Agreement and Release, Mr. KNOWLES must submit to the local Human Resources Department, a signed statement to that effect by close of business of the seventh (7th) day. If Mr. KNOWLES does not timely submit a revocation, this Severance Agreement and Release shall become effective on the eighth (8th) day after the date entered in the "DATE" section below.

15. This Severance Agreement and Release sets forth the entire agreement between the parties and fully supersedes any and all prior agreements or understandings between the parties pertaining to the subject matter of this Severance Agreement and Release. This Severance Agreement and Release, however, shall not affect any right either party has or may have against the other regarding Worker's Compensation claims and Supplemental Benefit payments made for those claims. The parties agree that this Severance Agreement and Release may not be modified or canceled in any manner except by a writing signed by Mr./Ms KNOWLES and an authorized PG&E official. If any provision of this release is found to be unenforceable, all other provisions will remain fully enforceable.

16. Mr. KNOWLES states that he/he/she has read this Severance Agreement and Release in its entirety, that he/she has been given the necessary time to consider its contents, that he/he/she fully understands its terms, that he/she has been advised that he/he/she should consult legal counsel of his/her choosing, that the only promises made to him/his/her to sign are those stated herein, and that he/he/she is signing this Severance Agreement and Release voluntarily.

PLEASE READ CAREFULLY. THIS SEVERANCE AGREEMENT AND RELEASE
INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.

_Arlene Lee_

PACIFIC GAS AND ELECTRIC COMPANY

_Tom Knowles_

EMPLOYEE

558727505

Social Security

7/6/01

DATE

6-29-01

DATE

# EXHIBIT D





SEVERANCE AGREEMENT AND RELEASE

This Severance Agreement and Release is made and entered into between Mr. THOMAS HICKS and the Pacific Gas and Electric Company (PG&E). Mr. HICKS and PG&E (collectively referred to as "the parties"), in their wish to compromise, resolve, settle, and terminate any dispute or claim between them with respect to Mr HICKS employment with PG&E and severance therefrom, have agreed as follows:

1. Effective close of business, 5/7/2001 Mr. HICKS was laid off from PG&E employment.

2. Within fourteen (14) calendar days after the effective date of this Severance Agreement and Release as determined in accordance with paragraph 14 of this agreement; PG&E shall pay to Mr. HICKS the amount of $67,520.59, less applicable deductions. Mr. HICKS understands he/she is responsible for paying any taxes on the amount paid to him/her pursuant to this Severance Agreement and Release. The parties understand and agree that the payment provided in this paragraph is in addition to, and does not affect, any payment and benefit to which Mr. HICKS may be otherwise entitled under PG&E's compensation, performance incentive, stock option, and other benefit programs.

3. Mr. HICKS represents that he/she does not have any pending claim, charge or action in or with any federal, state or local court or any administrative agency against PG&E, its officers, attorneys, agents, employees, subsidiaries, parent company, and affiliated companies.

4. In consideration for the payment which PG&E shall provide Mr. HICKS under this Severance Agreement and Release, Mr. HICKS In behalf of his/herself, his/her heirs, estate, executors, administrators; successors, and assigns, releases and agrees to hold harmless PG&E, its officers, attorneys, agents, employees, assigns, subsidiaries, parent company, affiliated companies, and successors, from all actions, causes of action, claims, disputes, judgments, obligations, damages, liabilities of whatsoever kind and character, relating to Mr. HICKS employment with PG&E, including his/her employment severance and any action which led to the severance. Specifically, Mr. HICKS understands and agrees that the actions, causes of action, claims, disputes, judgments, obligations, damages, and liabilities covered by the preceding sentence include, but are not limited to, those arising under any federal, state, or local law, regulation, or order relating to civil rights (including employment discrimination on the basis of race, color, religion, age, sex, national origin, ancestry, physical handicap, medical condition, veteran status, marital status, and sexual orientation), wage and hour, labor, contract, or tort.

5. Mr. HICKS understands and agrees that this Severance Agreement and Release extends to all claims of every nature and kind whatsoever, known or unknown, suspected or unsuspected, past or present, and all rights under Section 1542 of the California Civil Code are his/hereby expressly waived. Such section reads as follows:

A general release does not extend to claims which the creditor does not know or suspect to exist in his/her favor at the time of executing the release, which if known to his/her must have materially affected his/her settlement with the debtor.

6.    Mr. HICKS agrees not to initiate, participate or aid, in any way, in any lawsuit or proceeding upon any claim released by him/her under this Severance Agreement and Release. Mr. HICKS understands and agrees that, if he/she violates his/her promise in the preceding sentence, he/she has engaged in a material breach of this Severance Agreement and Release. This paragraph, however, shall not prohibit Mr. HICKS from participating in an Equal Employment Opportunity Commission investigation or proceeding, if subpoenaed to do so by the Equal Employment Opportunity Commission. PG&E acknowledges that Mr. HICKS may be legally required to appear and testify at a deposition, court hearing or trial, or otherwise respond to a subpoena. In the event of any such request, Mr. HICKS shall notify PG&E Human Resources of such request.

7.    Mr. HICKS represents and agrees that prior to signing this Severance Agreement and Release, he/she has returned to PG&E all originals and copies of all files, memoranda, records, software, credit cards, identification cards, keys, and any other property of PG&E or its affiliates which he/she had in his/her possession, custody or control.

8.    Mr. HICKS agrees not to use, disclose, publicize, or circulate any secret, confidential or proprietary information concerning PG&E, its subsidiaries, parent company, or affiliates, which has come to his/her attention during his/her employment with PG&E, unless his/her doing so is consistent with any rights he/she may have under any applicable whistleblower laws, is authorized in writing by PG&E's Human Resources Department or is required by law, including subpoena. Before making any legally-required disclosure, Mr. HICKS shall give PG&E as much advance notice as possible. Mr. HICKS further agrees that his/her violation of this paragraph shall constitute a material breach of this Severance Agreement and Release.

9.    Mr. HICKS agrees that, if called upon to do so, he/she will cooperate with, and provide reasonable assistance to, PG&E to protect and further its lawful interests in all judicial, administrative, investigative, and legislative proceedings involving PG&E or any aspect of its operations. The parties agree that this paragraph does not affect Mr. HICKS's legitimate exercise of his/her rights under applicable whistleblower laws or his/her obligation to comply with all validly-issued court or administrative orders, including subpoenas. Mr. HICKS further agrees that his/her violation of this paragraph shall constitute a material breach of this Severance Agreement and Release

10. Mr. HICKS understands and agrees that if he/she engages, or has engaged, in misconduct that would warrant his/her termination of employment under PG&E's employee conduct standards and the collective bargaining agreement's just cause standard, he/she shall forfeit his/her right to sign this Severance Agreement and Release.

11. Any dispute regarding any aspect of this Severance Agreement and Release, including its validity, interpretation, or any action which would constitute a violation of this Severance Agreement and Release (hereinafter referred to as an "arbitrable dispute") shall be resolved by an experienced arbitrator, selected by the parties in accordance with the rules of the American Arbitration Association. The fees of the arbitrator and the cost associated with producing a transcript of the proceedings shall be paid in equal shares by Mr. HICKS and PG&E. The parties agree that arbitration shall be the exclusive remedy for resolving arbitrable disputes and that the decision of the arbitrator shall be final and binding. The judgment rendered by the arbitrator on any award may be entered in any court having competent jurisdiction. The parties agree that this paragraph shall not apply to the lawful exercise of any right        Mr. HICKS may have under the Age Discrimination and Employment Act and that such matters shall be governed by the provisions of said Act.

Mr. HICKS understands and agrees that, if he/she initiates a proceeding, other than an arbitration proceeding as described above, to set aside or challenge the validity of this Severance Agreement and Release, he/she shall repay to PG&E the payment he received under this Severance Agreement and Release concurrent with his/her initiation of the proceeding. Mr. HICKS's failure to make the prescribed repayment shall be a basis for rejecting his attempt to set aside or challenge the validity of this Severance Agreement and Release. Mr. HICKS further understands and agrees that, if his/her attempt to set aside or challenge the validity of this Severance Agreement and Release is rejected, he/she shall pay to PG&E any loss, cost, damage, or expense, including, without limitation, attorney's fees PG&E incurred in the proceeding, within seven (7) calendar days from the final decision rejecting his/her attempt. Further, not withstanding the foregoing, if Mr. HICKS obtains against a monetary judgment or settlement against PG&E for a claim released by him/her under this Severance Agreement and Release, the payment he/she received under this Agreement shall be deducted from any such judgment or settlement. The parties agree that this paragraph shall not apply to the lawful exercise of any right Mr. HICKS may have under the Age Discrimination and Employment Act and that such matters shall be governed by the provisions of said Act.

12. Mr./Ms. HICKS agrees that, if he/she engages in a material breach of this Severance Agreement and Release, he/she shall repay to PG&E the payment he/she received under this Severance Agreement and Release within seven (7) calendar days upon written demand by PG&E. The parties agree that this paragraph shall not apply to the lawful exercise of any right Mr. HICKS may have under the Age Discrimination and Employment Act and that such matters shall be governed by the provisions of said Act.

13. This Severance Agreement and Release shall not be considered an admission of liability or a violation of any applicable contract, law, rule, regulation, or order of any kind.

14. Mr. HICKS understands and agrees that all claims he/she may have arising under the Age Discrimination in Employment Act before he/she signs this Severance Agreement and Release are covered by paragraphs 4 and 5 of this Severance Agreement and Release and that his/her waiver of those age discrimination claims is an integral part of the release aspect of this agreement. Therefore, consistent with the Older Workers Benefit Protection Act, Mr. HICKS states that he/she was informed that, when given this Severance Agreement and Release, he/she could take up to 45 calendar days to consider its provisions. Mr. HICKS was also advised that he/she may elect to sign this Severance Agreement and Release before the expiration of the 45-day consideration period, but is under no obligation to shorten the period. Mr. HICKS further understands that, if he/she signs this Severance Agreement and Release by affixing his/her signature and date in the "EMPLOYEE," "*Social Security*," and "DATE" sections of this agreement below, he/she may revoke it within seven (7) calendar days of the agreement's execution. To revoke this Severance Agreement and Release, Mr. HICKS must submit to the local Human Resources Department, a signed statement to that effect by close of business of the seventh (7th) day. If Mr. HICKS does not timely submit a revocation, this Severance Agreement and Release shall become effective on the eighth (8th) day after the date entered in the "DATE" section below.

15. This Severance Agreement and Release sets forth the entire agreement between the parties and fully supersedes any and all prior agreements or understandings between the parties pertaining to the subject matter of this Severance Agreement and Release. This Severance Agreement and Release, however, shall not affect any right either party has or may have against the other regarding Worker's Compensation claims and Supplemental Benefit payments made for those claims. The parties agree that this Severance Agreement and Release may not be modified or cancelled in any manner except by a writing signed by Mr./Ms HICKS and an authorized PG&E official. If any provision of this release is found to be unenforceable, all other provisions will remain fully enforceable.

16. Mr. HICKS states that he/he/she has read this Severance Agreement and Release in its entirety, that he/she has been given the necessary time to consider its contents, that he/he/she fully understands its terms, that he/she has been advised that he/he/she should consult legal counsel of his/her choosing, that the only promises made to him/his/her to sign are those stated herein, and that he/he/she is signing this Severance Agreement and Release voluntarily.

4

**PLEASE READ CAREFULLY. THIS SEVERANCE AGREEMENT AND RELEASE INCLUDES A RELEASE OF ALL KNOWN AND UNKNOWN CLAIMS.**

_Arlene Lee_

PACIFIC GAS AND ELECTRIC COMPANY

EMPLOYEE

549883618
Social Security

1/2/01

6/25/01

DATE

DATE